J-S48033-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| DAVID C. BEATTY | |
| Appellee | No. 197 WDA 2015 |

Appeal from the Order Entered on January 14, 2015
In the Court of Common Pleas of Beaver County
Criminal Division at No.: CP-04-0001646-2014

BEFORE:  PANELLA, J., DONOHUE, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                   **FILED SEPTEMBER 22, 2015**

The Commonwealth appeals the January 14, 2015 order granting David Beatty's pre-trial petition for writ of *habeas corpus*.  We affirm.

The trial court aptly summarized the tragic factual and procedural history of this case as follows:

> On July 4, 2014, a bedroom clothes dresser fell on [top of Beatty's] two children, Ryeley, age three, and Brooklyn, age two, while they were in . . . their home in Aliquippa, Pennsylvania and caused their death.  On October 6, 2014, [Beatty] was charged in a four count criminal information with two counts of involuntary manslaughter, 18 Pa.C.S. § 2504(a), and two counts of endangering the welfare of children, 18 Pa.C.S. § 4304(a)(1).  [Beatty's] wife and the mother of the deceased children, Jennifer Beatty, also resided in the home, but was not present during the incident.  She was charged with two counts of endangering the welfare of children[.]

Trial Court Opinion ("T.C.O."), 3/17/2015, at 1-2 (minor modifications for clarity).

On September 11, 2014, Beatty appeared for his preliminary hearing before Magisterial District Judge Andrew M. Hladio. The trial court summarized the evidence presented by the Commonwealth at that hearing as follows:

On July 4, 2014, Detective [Steven Roberts, of the Aliquippa Police Department] received a report of two unresponsive children at [Beatty's] residence. [When] he arrived at the residence, one child was laying on the front porch and the other child was laying on the front yard; both were being treated by firemen, police officers, [and] paramedics. The children were transported to the local Heritage Valley Hospital. Brooklyn was pronounced dead at Heritage Valley Hospital. Ryeley was flown to Children's Hospital in Pittsburgh, where she later died. Shortly after his arrival at the residence, Detective Roberts asked [Beatty] how the children were injured. [Beatty] told him that he observed the children sitting on a dresser drawer and then [he] went to the bathroom to prepare a bath for them. While in the bathroom, he heard a crash, returned to the room within seconds, and found the dresser on top of the children. [Beatty] advised that he then moved the dresser, placed the children on the bed, called 911, and began preforming [Cardiopulmonary Resuscitation ("CPR")] until first responders arrived.

After the children were transported from the scene, Detective Roberts asked [Beatty] to once again describe how the children were injured and to show him where this incident occurred inside of his home. Once inside the home, Detective Roberts observed "a high amount of clutter" and described the house as "very filthy." [Beatty] showed Detective Roberts the bedroom where the children were injured and the bathroom where he was at the time of the incident. [Beatty] also showed Detective Roberts the dresser drawer, and demonstrated that it was pulled out approximately three to four inches at the time he observed the children sitting upon it.

Later that evening, Detective Roberts, along with Captain [Ryan Pudik from the Aliquippa Police Department,] spoke with [Beatty] at Children's hospital. During this interview, [Beatty] stated that he had been using the bathroom when he heard a

"bang," he then called out to the children and received no response. [Beatty] estimated that he checked on the children within one or two minutes of hearing the noise. Upon further questioning, [Beatty] stated that, after hearing the "bang," he many have remained in the bathroom for up to five minutes before he checked on the children. Due to the discrepancies in [Beatty's] recitation of the events, Detective Roberts asked Detective [Timmie Patrick, a Beaver County Detective] to interview [Beatty] further.

\* \* \* \*

On July 4, 2014, Detective Patrick interviewed [Beatty] at Children's Hospital, at Detective Roberts' request. [Beatty] told Detective Patrick that he was in the bathroom for approximately five minutes when he heard a "bang" from the children's room, and assumed they were jumping on the bed; he then responded within 30 seconds to one minute and discovered the dresser on [top of] the children. Upon further questioning, [Beatty] stated that, after he heard the "bang," he called out to Ryeley, did not receive a response, and stayed in the bathroom for another ten to twelve minutes before checking on the children.

Detective Patrick spoke with [Beatty] again on July 7, 2014. Detective Patrick advised [Beatty] that there were "discrepancies," and [Beatty] then told him, "Yeah, I know. There's [] a lot more time that I was in the bathroom." During the interview, [Beatty] advised that after hearing the "bang," calling out to Ryeley, and receiving no response, he remained in the bathroom for an additional 20 to 25 minutes. [Beatty] explained to Detective Patrick that he remained in the bathroom because he suffers from irritable bowel syndrome.

\* \* \* \*

Dr. [Todd Luckasevic, an expert in forensic pathology,] performed an autopsy on Brooklyn on July 5, 2014, and an autopsy on Ryeley on July 6, 2014. Dr. Luckasevic found that each child died as a result of asphyxiation due to compression of the chest. Dr. Luckasevic also found that the "manner of death" for each child was accidental; he went on to explain, "accidental is [an] unforeseen outcome. You get in your car this afternoon and you drive home, and you . . . get in an accident. That's unforeseen. That these children were playing during the day[,] it was unforeseen that they would wind up dead that evening."

Dr. Luckasevic further testified as to the . . . children's likelihood of survival had they received care within certain periods of time:

- Had the children received care within thirty seconds of the dresser falling on them, there was a good chance that they would survive with a full recovery, though they may have required assistance, such as an "external rub" or CPR.

- Had the children received care within ninety seconds after the dresser fell on them, or later, there was no chance of meaningful survival; the children could have been kept alive indefinitely on life support, but at ninety seconds they would have been clinically brain dead.

- Had the children received care within thirty to ninety seconds, there is a "gray zone" in which they may or may not have survived. Dr. Luckasevic explained that for survival during this time period "[y]ou're going to need to know how to do CPR. You're going to need to know basic life support, and potentially it's going need to be done by either an emergency nurse or physician at this point . . . ."

*Id.* at 2-6 (minor modifications for clarity; citations to preliminary hearing transcript omitted).

At the conclusion of his preliminary hearing, the Magisterial District Judge held all of Beatty's charges for trial. On November 12, 2014, Beatty filed a petition for writ of *habeas corpus*, averring that the Commonwealth failed to present a *prima facie* case as to the two counts of involuntary manslaughter. On December 15, 2014, the trial court held a hearing on Beatty's petition. The Commonwealth submitted into evidence the September 11, 2014 preliminary hearing transcript, the children's autopsy reports, and another report drafted by Dr. Luckasevic. On January 14, 2015, the trial court granted Beatty's petition and dismissed both counts of involuntary manslaughter. Specifically, the trial court held that the

Commonwealth failed to establish the *mens rea* necessary to support either involuntary manslaughter charge.

On January 30, 2015, the Commonwealth filed a notice of appeal. On February 9, 2015, the trial court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Commonwealth timely complied. On March 17, 2015, the trial court filed a Pa.R.A.P. 1925(a) opinion.

The Commonwealth presents one issue for our consideration: "Whether the [trial c]ourt erred in granting the *[habeas* p]etition for the charge of [i]nvoluntary [m]anslaughter." Brief for Commonwealth at i.

Appellate review of an order granting *habeas corpus* relief is subject to the following principles:

> The decision to grant or deny a petition for writ of *habeas corpus* will be reversed on appeal only for a manifest abuse of discretion. It is settled that a petition for writ of *habeas corpus* is the proper means for testing a pre-trial finding that the Commonwealth has sufficient evidence to establish a *prima facie* case. Although a *habeas corpus* hearing is similar to a preliminary hearing, in a *habeas corpus* proceeding the Commonwealth has the opportunity to present additional evidence to establish that the defendant has committed the elements of the offense charged.
>
> A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. The Commonwealth need not prove the defendant's guilt beyond a reasonable doubt. Rather, the Commonwealth must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury.

*Commonwealth v. Keller*, 823 A.2d 1004, 1010-11 (Pa. Super. 2003) (citations omitted). "In determining the presence or absence of a *prima facie* case, inferences reasonably drawn from the evidence of record that would support a verdict of guilty are to be given effect, but suspicion and conjecture are not evidence and are unacceptable as such." *Commonwealth v. Packard*, 767 A.2d 1068, 1071 (Pa. Super. 2001) (citation omitted).

> The Crimes Code defines involuntary manslaughter as follows:
>
> A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S. § 2504(a).

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3).

Although Section 2504 extends to conduct that is either reckless or grossly negligent, the Pennsylvania Supreme Court has construed those terms identically in this context. *See Commonwealth v. Comer*, 716 A.2d 593, 597 (Pa. 1998) (holding that the definition of "recklessly" set forth in

Section 302 encompasses "gross negligence" in Section 2504). Therefore, in order to overcome Beatty's petition for *habeas corpus*, the Commonwealth needed to offer evidence to demonstrate a *prima facie* case that Beatty acted recklessly. The Commonwealth concedes that it failed to do so. ***See*** Brief for Commonwealth at 5 ("The Commonwealth believes that Beatty did not consciously act or in act [*sic*] to create [a] substantial risk, rather it was unconscious inadvertent conduct of Beatty which created risk [*sic*] and caused the children's death."). Instead, the Commonwealth argues that Beatty acted "negligently."

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(4).

The Commonwealth maintains that it produced sufficient evidence that Beatty acted with the above defined *mens rea*. This may be true, but the involuntary manslaughter statute speaks in terms of "gross negligence" rather than mere negligence. Our Supreme Court has rejected the argument that these two levels of culpability are one in the same.

> [T]he fact that criminal negligence differs from tort negligence does not mean that the negligence defined in Section 302 of the Code is the equivalent of the "gross negligence" contemplated in Section 2504. If the General Assembly had intended for Section 302 negligence to be sufficient to establish the *mens rea*

necessary for involuntary manslaughter, it need not have added the modifier "gross." Given the principle of statutory construction requiring that we view the language of a statute in such a way as to give effect to all of its terms, *see* 1 Pa.C.S. § 1921(a); ***Commonwealth v. Gilmour Mfg. Co.***, 822 A.2d 676, 679 (Pa. 2003), we cannot construe the reference to "gross negligence" in Section 2504 as requiring mere proof of the "negligent" (or "criminally negligent") state of mind defined in Section 302.

***Commonwealth v. Huggins***, 836 A.2d 862, 867 (Pa. 2003).

The law is clear that a showing of mere negligence or "criminal negligence" does not satisfy the Commonwealth's burden of proving the necessary *mens rea* for involuntary manslaughter. Because the Commonwealth concedes that it failed to demonstrate that Beatty acted recklessly, as defined in 18 Pa.C.S. § 302(b)(3), the trial court neither erred nor abused its discretion in granting Beatty's petition for writ of *habeas corpus*.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2015

- 8 -